Eddie Edward Mastin was indicted for the murder of his mother, Cleo Mastin, in violation of § 13A-6-2, Code of Alabama, 1975. The jury found the appellant guilty as charged and the trial judge set sentence at 99 years' imprisonment in the penitentiary.
The facts in this case are not in dispute and will therefore be briefly stated. On the evening of December 12, 1981, the appellant was at home with his mother, his brother, Steve, and his grandmother, Ida Carter. At some point, the appellant began rubbing his head and complained to his mother about a headache. His mother told *Page 246 
him to take some medicine. The appellant then went and got a shotgun and shot and killed his mother.
When the appellant's brother, Steve, heard the shot he came into the den from the bedroom. The appellant was in the process of loading the gun. When Steve saw what had happened, he told the appellant he was going to kill him. The appellant then shot at his brother, who managed to avoid the shot and get away.
A short time later, the appellant was stopped for a routine traffic violation by Officer Ron Alexander of the Lauderdale Sheriff's Department. When Alexander asked for the appellant's driver's license, he noticed a shotgun on the back seat of the appellant's vehicle. Alexander and the appellant then got in the patrol car so that Alexander could write the appellant a ticket, while running a check for outstanding warrants. At this time, Alexander asked the appellant about the shotgun and he replied he had just shot someone. Alexander then received a dispatch that the appellant was wanted for questioning in connection with a shooting in Colbert County. The appellant was then turned over to the Colbert County authorities.
 I
The appellant filed a plea of not guilty by reason of insanity in this case and the majority of the evidence presented at trial pertained to this issue.
The law of insanity is summarized in Cunningham v. State,426 So.2d 484 (Ala.Crim.App. 1982), cert. denied, (Ala., February 11, 1983). In that opinion, authored by Judge Bowen, we find that:
 "`A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Alabama Code 1975, Section 13A-3-1 (a). The legal principles governing the burden and sufficiency of proof of insanity were collected in Christian v. State, 351 So.2d 623 (Ala. 1977).
"`Those principles may be summarized as follows:
 "`1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "`2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "`3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "`4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "`5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "`6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.
 "`Authority for each of these principles may be found in Christian, supra, at 351 So.2d 624.
 "`The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 "`Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.' Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).
 "Herbert v. State, 357 So.2d 683, 688-89
(Ala.Cr.App.), cert. denied, 357 So.2d 690
(Ala. 1978). Generally, see Anno. 17 A.L.R.3d 146 (1968)." Cunningham, supra, at 486.
Defense counsel argues that this case is one of the few in which the exception has been found to apply. He contends that the evidence of the appellant's insanity was so overwhelming that it overcame the presumption of sanity.
The defense called a number of witnesses who testified as to appellant's insanity. Numerous members of the community in which the appellant lived, including friends, *Page 247 
neighbors, his father and stepmother, testified that they had observed a change in the appellant over the several years prior to the murder at issue. They testified the appellant exhibited unusual behavior like sleeping in cars and in the rafters of buildings. He was withdrawn, seemed depressed and would be "off" in another world for long periods of time.
The one expert witness for the defense was Dr. Joseph Glaister, a psychiatrist and Medical Director of the Riverbend Mental Health Center. Dr. Glaister said he had been in contact with the appellant since 1976 and over the years the appellant had a history of mental illness. His records indicated that the appellant had complained of hallucinations and delusions and his condition was diagnosed as chronic, undifferentiated schizophrenia. Antipsychotic medication had been prescribed for the appellant and the evaluations of the appellant indicated his condition would likely deteriorate over the years. Dr. Glaister stated the appellant had been involuntarily committed to the Department of Mental Health by his mother. He testified that the observations of the appellant by the other defense witnesses are symptoms of schizophrenia.
Some eight months after the murder at issue, an evaluation was again performed on the appellant. He was found to be a paranoid schizophrenic. Dr. Glaister testified that the appellant's killing of his mother most likely was caused by his mental illness. He did not believe the appellant could fake his mental illness.
Even though evidence of an accused's insanity is overwhelming, it must also be undisputed for this court to find that the jury's verdict was contrary to the evidence presented at trial. Cunningham, supra. While the evidence of the appellant's insanity was strong, it was not undisputed.
The State presented three members of the appellant's family who testified as to his sanity. His two brothers and sister, who had close contact with this appellant, testified the appellant would act certain ways to get sympathy and attention from the others. His brother, Steve, who saw the appellant immediately before and after the shooting, testified that on one occasion the appellant threatened to kill his sister over some moonpies. The appellant said that if he killed her he could "go to the retreat and stay three weeks, six months and get out on the street . . . because he had papers saying he was crazy." (R. 312). All three of these witnesses testified they believed the appellant was sane.
Since there was conflicting evidence as to the appellant's insanity, the question was properly submitted to the jury.Cunningham, supra, and authorities cited therein. After a thorough review of the evidence, we find there was evidence which would have supported the jury's finding that the appellant was, in fact, sane. Therefore, we hold the issue of the appellant's sanity was a question for the jury, which they properly resolved against the appellant.
 II
During the closing argument of the prosecution, the following dialogue took place:
 "MR. HOVATER: Your Honor, could we approach the bench?
"BY THE COURT: Yes.
 "(At this time the attorneys approach bench outside the hearing of the jury at which time the following was said.)
 "MR. HOVATER: I'd like to make an objection to the prosecutorial misconduct by Mr. Patton in referring to the Defendant not taking the stand to testify in his behalf.
"BY THE COURT: Which remark are you referring to?
 "MR. HOVATER: Both remarks. All right, I'll say I didn't object to the first one, but my objection maybe wasn't timely, but I'm objecting to this last one. Let me make a showing also in his closing argument Mr. Patton has referred to how the Defendant has sat over there and has not said anything. Defense counsel feels that this is a comment on *Page 248 
the Defendant not taking the stand. I move for a mistrial at this time.
 "MR. PATTON: Let me put a statement in. As I recall my statement it was he sat over there with his head down. I haven't said anything about him not talking.
"BY THE COURT: O.K., I'm going to overrule —
 "MR. HOVATER: Your Honor, I think it will show that he sat over there not talking also.
 "BY THE COURT: I want to put in the record that I've had the Court of Criminal Appeals one time reverse me because Mr. Patton said the same thing about somebody else that sat over there that couldn't do anything that was asleep because he was on drugs and they reversed me because I didn't instruct the jury immediately that they are to disregard that remark and I want ya'll to tell me something if I remember correctly you asked several witnesses if he looked then like he did over there and if I remember correctly one time Mr. Hovater, you asked and has he said anything during this whole trial.
"MR. HOVATER: Who did I ask that to?
 "BY THE COURT: I remember thinking — I remember thinking that he didn't have to say anything and I wondered why you were asking him. Dr. Glaister.
 "MR. HOVATER: Well, I am noting my objection at this time. I've asked about appearances, about his physical appearance and I'm noting my objection.
 "BY THE COURT: O.K., well, I'm going to say this I'm not going to grant the motion for mistrial, but I am going to say this I'm instructing you that you not to say anything about him not saying anything.
"MR. PATTON: I don't think I said that Judge —
 "BY THE COURT: Not in the last remark you didn't." (R. 365-367).
As the appellant points out in his brief, it is reversible error for the prosecution to comment on the accused's failure to take the stand unless the appropriate curative instructions are given to the jury.
 "Where the prosecutor's argument passed beyond the bounds of legal propriety, it is the appellant's duty to specifically object and to preserve for the record substantially the language deemed improper. Flowers v. State, 269 Ala. 395, 113 So.2d 344 (1959). The record must disclose with reasonable certainty what was said by the prosecutor in order for this court to attempt an informed review of the challenged comments. Only when this is done, can this court know with reasonable certainty what was said in the court below which influenced the trial judge to rule as he did. Otherwise, the great presumption in favor of the correctness of the ruling of the trial judge will prevail. McClary v. State, 291 Ala. 481, 282 So.2d 384 (1973)."
Huffman v. State, 360 So.2d 1038 (Ala.Crim.App. 1977), affirmed360 So.2d 1045 (Ala. 1978). See also Earley v. State,358 So.2d 494 (Ala.Crim.App.), cert. denied, 358 So.2d 501 (Ala. 1978);Carden v. State, 382 So.2d 1158 (Ala.Crim.App.), cert. denied,382 So.2d 1162 (Ala. 1980).
As can be seen from the above quoted portion of the record, it is not clear exactly what was said by the prosecutor. Defense counsel seemed to have one impression of what was said while the prosecutor and the trial judge seemed to have another. Since we cannot determine whether or not the prosecutor made any direct reference to the appellant's failure to testify, we must affirm on this issue, since there is nothing properly preserved for our review. Huffman, supra.
 III
The appellant asserts reversible error occurred because the trial judge failed to give curative instructions to the jury after the prosecutor used the word "murder" during the examination of one of the State's witnesses. Defense counsel objected to the prosecutor's use of the term and *Page 249 
the trial judge immediately sustained the objection. Defense counsel failed to request curative instructions and none were given. Therefore, there is nothing preserved for our review.Proctor v. State, 391 So.2d 1092 (Ala.Crim.App. 1980).
Moreover, any prejudicial effect of the prosecutor's remark was eradicated by the trial judge's prompt action in sustaining the objection. Sales v. State, 435 So.2d 242 (Ala.Crim.App. 1983).
 IV
The following discussion occurred during the closing argument of the prosecutor:
 "MR. HOVATER: Your Honor, could I ask Mr. Patton to speak up, I just can't hear. I can't tell whether I need to object to something or not.
"BY THE COURT: Can you speak up a little bit please.
 "MR. PATTON: Judge, I want to talk to the jury. That's the ones I'm interested in talking to and if he wants to get somewhere else, I —
 "MR. HOVATER: Well, Your Honor, I respectfully request that and I would hope that the Court would see that to represent my client, an occasion might arise where I need to object to something he might say and I would respectfully ask that.
"BY THE COURT: I have already done it.
"MR. PATTON: I'm sorry?
 "BY THE COURT: I said, I've already asked you to speak up a little bit please. I can't hear it either.
 "MR. PATTON: Well, I'm not talking to you either, Judge —
 "MR. HOVATER: Your Honor, I'm sorry that he doesn't want me or you to hear what he's saying, but I —
 "BY THE COURT: Ya'll stop it, just speak up a little bit. I have a hard time hearing, we had hearing problems last week." (R. 370).
Defense counsel contends the remarks of the prosecutor were prejudicial to the interests of his client. While we do not condone the attitude of the prosecutor toward the trial judge or his opposing counsel in the preceding discussion, we do not find such to be reversible error. The trial judge asked the prosecutor to speak louder as requested by defense counsel. There were no further objections to or references made concerning the prosecutor's level or tone of speech in the record. Therefore, nothing is before this court to review on this issue.
 V
The appellant objects to the admission of the portion of Officer Alexander's testimony concerning the statement the appellant made that he had just shot someone when asked about the shotgun. The appellant contends this statement was made before the appellant was given his Miranda rights and, therefore, the statement was admitted in violation of Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).
 "Before law enforcement officers can subject a citizen to custodial interrogation, he must first have been given the Miranda warnings. In Miranda
`custodial interrogation' was defined as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' This court has yet to formulate a general rule for distinguishing custodial from non-custodial interrogation but instead has preferred to take a case-by-case approach. . . . In making the distinction between custodial and non-custodial interrogation this court has singled out certain criteria as having special significance; these include probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. Although none of these factors is alone determinative, we have recently indicated that the most compelling is whether or not the focus of the investigation has finally centered on the defendant." (Footnotes omitted).
Brown v. Beto, 468 F.2d 1284 (5th Cir. 1972). See also Hallv. State, 399 So.2d 348 (Ala.Crim.App. 1981). *Page 250 
At the time Alexander asked the appellant about the shotgun, he was unaware that this murder had occurred or more importantly, that the appellant was wanted for questioning in connection with the murder. It was not until after the appellant made this statement that Alexander learned the appellant was wanted in connection with the murder. Since Alexander did not know about the murder or the appellant's connection therewith, it would be inaccurate to say the focus of the investigation of the murder was on this appellant. Alexander did not have probable cause to arrest the appellant and he was not interrogating the appellant with this murder in mind. Alexander was merely inquiring about the shotgun he had seen.
In the instant case, the questioning of the appellant about the gun is not the type of in-custody investigation addressed by the United States Supreme Court's opinion in Miranda, supra. Alexander was making a general investigation while detaining the appellant for the purpose of writing a ticket and while he was unaware of the murder in question. This is consistent with good police work.
We hold Alexander's testimony concerning the appellant's statement did not violate Miranda, supra, and such statement was, therefore, admissible.
 VI
During the cross-examination of one of the defense witnesses, the prosecutor made reference to the appellant's actions after he left the courtroom. Defense counsel objected to this statement on the grounds that it wsa not supported by the evidence. The trial judge ultimately sustained the objection. Therefore, there is no adverse ruling for us to review.Proctor, supra.
For the reasons stated above, the judgment of the trial court is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.